The State v. Foster.

2. THE same: choice of remedies: equity.

---

## THE STATE v. FOSTER.

**Criminal Law:** CONTINUANCE ON COURT'S OWN MOTION. Defendant was charged with murder in the first degree. On the second day of the term he moved for a continuance to the next term for the purpose of procuring the testimony of absent witnesses. As the record then stood, the motion was properly overruled, and defendant excepted. Afterwards defendant moved for a postponement of the trial to a subsequent day of the term, and the motion was granted. The record upon this motion shows that there was then credible evidence before the court that the depositions of the absent witnesses had been taken and mailed to the place of trial, but, by no fault of defendant, they had failed to arrive; and that the witnesses had therein testified to facts inconsistent with defendant's guilt. On the day to which the trial had been postponed these depositions had not yet arrived, but no further continuance was then asked, and defendant was put upon his trial, found guilty, and sentenced to death. *Held* that it was the duty of the court, in the furtherance of justice, after learning the facts which the

The State v. Foster.

evidence tended to prove, and which were inconsistent with defendant's guilt, to continue the cause to the next term on its own motion, upon the application made therefor at the beginning of the term, though a postponement to a day in the same term was afterwards asked, granted and accepted.

*Appeal from Taylor District Court.*—HON. JOHN W. HARVEY, Judge.

FILED, MAY 8, 1890.

INDICTMENT for murder in the first degree. The indictment charges that the defendant, about the third day of November, 1887, murdered one Emmet Reed. It was returned on the twenty-eighth day of November, 1887, and the cause continued to the February term, 1888, when the indictment was tried and a verdict of guilty returned, fixing the degree of the crime as murder of the first degree; and, from a judgment imposing the death penalty, the defendant appeals.

*L. T. McCoun* and *Phillips & Day*, for appellant.

*John Y. Stone*, Attorney General, for the State.

GRANGER, J.—Emmet Reed owned two spans of mules and a span of mares, with three sets of harness, a wagon, tent and other camp equipage, with other articles of property, and had been engaged at work on a railroad in Iowa. The first days of October, 1887, with the property mentioned, and in company with the defendant, who was also a railroad laborer, he passed south through Taylor county, Iowa, bound for Missouri, for railroad work. On the second of November, 1887, Reed and the defendant returned from the south with the same teams and other property, and passed through Blockton, in Taylor county, in the afternoon. On the night of the second of November, they went into camp near Skinner's bridge, about two miles north of Blockton, on the bank of Platt river. On the morning of the third of November, between daylight and sunrise, the defendant was alone in the camp with the teams,

and hitched them to the wagon and drove away. He passed through Bedford in said county, and traveled west to Nebraska City. When Reed and defendant were at Blockton, on the second of November, the two spans of mules were hitched and driven in front of the wagon, and the span of mares was led behind. The lead span of mules was hitched by the aid of a short, linked chain, known as a "fifth chain," and in the wagon was a trunk belonging to Reed, and an open box with horseshoes and other articles of iron. On the sixth of November, in the river, about two rods from the camp occupied the night of November 2, was found, floating, Reed's trunk; and his body was soon after "fished up" from the bottom of the river, and around the neck was found the "fifth chain" spoken of. In the water were also found a lot of horseshoes, some wire and a "brass car box." Reed's skull, on the top, had been crushed in by a blow, apparently, from this car box, and was evidently fatal. From the camp fire to the river there was a trail indicating that the body had been drawn to and thrown into the river. In fact, the record is such that we may assume that Reed was killed near the camp fire by some one, and the body sunk in the river. The real point in controversy is who committed the crime.

The facts sought to be established by the defendant are substantially as follows: That prior to the second of November, there had been talk between him and Reed as to his purchase of the teams and outfit; that on the evening of the second of November, when in the camp described, they concluded their agreement, the purchase price to be six hundred and forty dollars, and the money was there paid; that, just before the completion of the transaction, two men by the names of Johnson and Parker, with a team, came to the camp from towards Blockton, and that the sale was completed and the money paid in their presence; that soon after the two men left the camp, returning towards Blockton, and about nine o'clock returned to the camp on their way north to Clearfield, some twelve miles distant, and

that Reed then placed his trunk and the box with irons, including the "fifth chain" referred to, in their wagon, and left with them, after which he was not seen by the defendant; that in going to Clearfield they lost their way, and stopped with a farmer till morning, and, because of the sickness of one of their horses, they did not reach Clearfield till about noon; and that, about four o'clock on the afternoon of the third, Parker left by train for the west, and left Reed and Johnson at the depot.

To prove these facts the defendant desired the presence of Johnson, Parker and one Adams; and at the November term of the court, 1887, at which the indictment was returned, he made his application for a continuance because of the absence of Johnson and other witnesses whose presence he desired, and the application was granted. At the February term, on the second day, the defendant renewed his application for a continuance because of the absence of the testimony of Johnson, Parker and Adams, besides that of other witnesses, which the court refused; and the correctness of this refusal we are to consider.

The application for the continuance at the November term showed that, when Johnson and Parker were at the camp, Parker's name was unknown, but Johnson's was known; that defendant was acquainted with him, and that he was a permanent resident of Scott county, Iowa; and that defendant believed the man now known to be Parker was also a resident of said county. The record discloses that the application was made on the twenty-second of November for a continuance to the next term, which the court then refused, but continued the cause to the twenty-seventh inst., and ordered the sheriff of Taylor county to proceed in person to Scott county, to secure such witnesses. The sheriff returned the subpœna not served, and reported that he could not learn that such men had ever been in the county. In addition to the report of the sheriff, the counter-showing to the application at the November term showed that the sheriff and his deputies in Scott county had

made diligent search in the county for Johnson, and could neither find Johnson nor any one who knew him. The affidavit of C. C. Campbell, auditor of Scott county, showed that he had resided in the county for thirty years, and had a large acquaintance with the people of the county, and had been a resident of different parts of the county, and did not know Johnson, and he had examined the records, and the name of Lewis T. Johnson did not appear on the "poll, assessor's or military books, or census returns of the county." Affidavits of some postmasters, and the city collector of Davenport, showing that no such man resided in the particular localities, also appear.

Referring, now, to the application for a continuance at the February term, of the ruling as to which very urgent complaint is made, and of the importance of which testimony, if in existence, there could be no question, the facts which defendant would seek to establish by Johnson and Parker will be understood. As to the witness Adams, defendant's claim was that he could show by him that he was on board the train, on the third of November, at Clearfield, going west; that he was acquainted with Parker; that he was on the platform of the car when Parker came aboard the train; that there were two men with him at the depot, whom he bade farewell, and called one of them Reed, but does not remember what he called the other; and that Adams traveled with Parker to Republican City, Nebraska. Soon after the November term of court the defendant was sent to the penitentiary at Ft. Madison, for safe-keeping, and remained there until a few days before the February term of court, at which he was tried. The duty of procuring evidence to be used in his behalf on the trial was left to his attorneys. It appears that Johnson has not since been found; and from the affidavit of L. C. McCoun, an attorney for defendant residing at Bedford, where the trial took place, it appears that he did not learn the names or location of Parker and Adams until the fifth or sixth days of February, 1888,

while he was in Phillipps county, Kansas. It then conclusively appears that prompt and vigorous steps were taken to secure a commission to take their depositions, and for that purpose a commission issued from the district court of Taylor county on the fourteenth or fifteenth day of February; the county attorney waiving time to aid the early taking of the testimony. The commission was directed to "any notary public in Phillipps county, Kansas," and was sent to one J. S. Barnes, at Phillippsburgh, in that county, a notary public, and was received by him on the sixteenth or seventeenth of February. The application for a continuance to the next term was filed on the twenty-first of February, it being the second day of the term, showing substantially the facts as stated as to the confinement of the defendant, the want of knowledge of the names and residence of the witnesses, the time the information was obtained, and of the issuance of the commission to take the depositions, and that they had not been returned, and also the facts to which the witnesses were expected to testify. The application was on the next day overruled, and the court proceeded to the trial of the indictment.

The following is taken from the record as presented by appellee's abstract:

"Comes now the defendant in this cause, and moves the court to postpone and adjourn further proceedings in said cause until Thursday, the first day of March, A. D. 1888. For cause of such motion, defendant states that the depositions of George Parker and John D. Adams were taken on the part of said defendant at Marvin, Kansas, and on the same day, to-wit, February 21, 1888, mailed to the clerk of this court, the same not having arrived; that therefore the same cannot be used at this time in behalf of said defendant in the trial now in progress. For further cause of this motion, see affidavit hereto attached, made a part hereof.

"D. E. WILLIAMSON,
"L. T. McCOUN,
"J. R. McCOUN,
"Attorneys for Defendant."

The motion is supported by the affidavit of J. S. Barnes to the effect that he received the commission on the sixteenth or seventeenth of February, and, being unable to attend to the taking of the depositions, he passed the commission to one C. H. Edgcomb, a notary public in the same county, and that both Parker and Adams appeared before said Edgcomb on the twenty-first of February, 1888, and gave their depositions. Barnes was not present at the taking of the depositions; but, from his statements, he saw and read them, and he states their contents in substantial accord with what the affidavit for the continuance shows the witnesses would swear to. Barnes states, on information from the notary Edgcomb, and the postmaster at Marvin, Kansas, that the depositions were mailed to Bedford, Iowa, on the twenty-first of February, but too late for the train going east that day. Barnes appeared in open court for cross-examination; and there is nothing in his testimony to materially impair the statements of his affidavit, nor is the truth of his statements questioned in argument to us. In fact, on this branch of the case, it is only urged, on behalf of the state, that there was a want of diligence, an acquiescence in the action of the court postponing the case to February 27, and that the cause had been once before continued at the instance of defendant, which facts will be noticed hereafter.

Other affidavits were filed in support of the motion to postpone the trial, and among them one by the postmaster at Bedford, Iowa, stating that "it frequently happens that mail addressed to this office goes to Bedford, Indiana, and Bedford, Pennsylvania, and then returns here. The mail is sometimes delayed from three to ten days in reaching here after going to these points." The following then appears as the action of the court: "*The Court.* Mr. Reporter, let it appear that during the time this motion was heard, and this examination, that the jury was sent out by the court. *The Court.* I understand they are expecting a train in thirty or forty minutes for the north,—a mail train;

and the court is disposed to wait before passing on this motion. *The Court.* The train for the north having arrived, and the depositions failing to come, the state agrees that the case may stand continued until half past one o'clock,—until the train from the south is due, which is 12:30; and the case will stand continued until half past one without passing on the motion, and at that time I will pass on the motion. At half past one, court was called. *The Court.* I understand that those depositions haven't come, Mr. McCoun. *McCoun.* I understand that the train hasn't come. *The Court.* There was a mail train came in from the north? *Answer.* Yes, sir. *Question.* And that those depositions didn't come? *The Court.* Mr. Reporter, I desire you to take down what I say in regard to passing on this motion, as it will be made a part of the record in this case. *McCoun.* I say, if we get this continuance, I think the court will have given us ample time, so far as the depositions are concerned, and we don't ask any further continuance for testimony. I have nothing in my mind now. I would not want to bind myself, and say nothing would arise. When the depositions arrive, we will be ready to go to work at any time. *The Court.* So far as the testimony is concerned? *McCoun.* Yes, sir. Here the case was continued until Thursday morning of this week; and at this time, Thursday morning, the depositions not having arrived, this case is resumed." The day following (March 2), the jury returned its verdict of murder of the first degree, affixing the death penalty, and on the sixth day of March judgment thereon was pronounced.

The peculiarities of the record have led us to make this extended statement, as from it we are to determine a question both delicate and important,—delicate in the sense that it involves a review of an exercise of discretion on the part of the district court; important in the sense that it involves the life of a human being. If we are to reverse the judgment, it must be on a state of facts never before presented to this court. The only

exception taken to the ruling of the court on a question of continuance was to the ruling on the third day of the term, in refusing a continuance to the next term. The application for a postponement on the twenty-seventh of February to March 1 was granted, and the record indicates that the defendant then thought it was all he could reasonably ask. A peculiarity of the case is this: With the condition of the record on February 23, we do not think the holding of the court erroneous. In the light of the record as then viewed, considering the application at the previous term, and the evident misstatements therein, the manner and piecemeal method of its presentation, which do not appear in our statement of the case, with other minor facts, there was much to discourage a belief in the sincerity of the effort to obtain the testimony. Later disclosures, through the affidavit of Barnes on February 27, leave little room for doubt that Parker and Adams were in Kansas, and their depositions taken. Certainly, Barnes is without conscience and an unblushing criminal at heart, if it is not true. If the depositions were taken, and true, it is morally and legally certain that the defendant is not guilty. His conviction was entirely on circumstantial evidence. The testimony, by the depositions in question, goes directly to the fact of the homicide. It is in no sense of technical significance. Hence, if the depositions are true, and the judgment is executed, the case is without even the palliation that he committed the act, though he might have avoided a record of guilt by the aid of legal refinements.

The case would be shorn of much of its difficulty, because of its legal bearings, if, after the facts were disclosed by the affidavit of Barnes, a continuance beyond the term had been asked, even if refused; for then we should have a case in which the district court acted upon the record as it is presented to us. Now we have a case in which, speaking alone of what was asked of the district court, we must approve its judgment as based upon the record at the time it acted; and we meet

the query whether we may go beyond what appeared to be the facts on the twenty-third of February, and determine the validity of the court's action upon what were the actual facts as shown by the testimony afterwards presented? Assuming the affidavit of Barnes to be true, and we have the actual facts that the depositions had been taken and mailed to Bedford, Iowa, in time for use on the trial, and were lost without fault of the defendant. If the district court had been asked, on that state of facts, to continue the case, and had refused, its judgment would, of course, be reversed. Nor have we reason to think the district court would have refused it. It is also significant that in the motion for a new trial the district court is not given an opportunity to pass upon such a state of facts, unless it should do so on it own motion. In civil cases, where only private interests are involved, judgments often receive support from such omissions and conditions of the record. Should such a rule obtain in criminal cases, and particularly in one in which the execution of the judgment is the taking of a human life? Such a rule could result in good to no one, and the judgments of all men would condemn it. The public can have no interest in the execution of an innocent man. This judgment once executed, even partial reparation, if afterwards demanded by developments, cannot be made. We think the defendant should have the benefit of the testimony of Parker and Adams, if obtainable, and that there is no interest that should claim his execution merely as the result of the negligence of his attorneys, if they were negligent, in obtaining the testimony or in properly protecting the record. If the record was less conclusive as to the existence of the depositions or as to their having been taken, our views might be different. We attach much importance to this particular feature of the case, and to the nature of the judgment.

If the district court, after full developments, had on its own motion offered the continuance sought at the

beginning of the term, its action would have been in harmony with a correct administration of the law, and what should have been done, though we know the practice to be unusual. The Code, section 4538, requires that in such case we must examine the record and render such judgment, and, if necessary, order a new trial. Believing that the district court should have permitted a trial at a subsequent term to enable the defendant to have the benefit of the testimony, we may now make an order that will effectuate such a purpose.

Having reached such a conclusion without reference to a paper found in the record entitled "Amendment to the original abstract," we now refer to it. We have not before referred to it, because of its doubtful propriety in the case. No question, however, has been made as to its authenticity; but it contains three affidavits, all of which appear to have been made after judgment was pronounced in the case, and two of them as late as March 12, 1889. The two are the affidavits of C. H. Edgcomb, before whom the depositions were taken, and one Frank Nixson,—the former stating that the depositions were taken before him, and properly mailed to Bedford, Iowa, on the twenty-first of February, 1888; the latter, that he was present, and saw the depositions subscribed by Parker and Adams, and saw them enclosed and mailed. The other is the affidavit of George Parker to the facts as claimed to have been stated in his deposition. Conceding that this additional abstract has no place in the record, it must operate to establish the justice of our holding that a new trial should be had.

We have examined the record, and think there are no other questions demanding our consideration. The judgment of the district court is reversed, and the case remanded for a new trial.

REVERSED AND REMANDED.